CASE No. CR-12-1606-PHX-SRB
No. CV _____

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

UNITED STATES OF AMERICA,

Plaintiff – Respondent,

v.

JOSEPH JOHN PLANY (only),

Petitioner – Defendant.

MOTION UNDER  28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY

Anders V. Rosenquist, Bar #002724
ROSENQUIST & ASSOCIATES
42104 N. Venture Court, Suite A122
Anthem, AZ  85086
TELEPHONE: (480) 861-7115
rosenquistlegal@gmail.com
*Attorney for Petitioner-Defendant*
*Joseph John Plany*

# PROCEDURAL BACKGROUND

Petitioner, Joseph John Plany ("Petitioner" or "Plany"), and Co-defendant, Paxton Anderson ("Anderson"), were indicted in the District Court of Arizona on September 11, 2012 on (31) counts of Bank Fraud in violation of 18 U.S.C. §1344, and one (1) count of Conspiracy to Commit Bank Fraud in violation of 18 U.S.C. §1349. The charges were based on construction loans for homes to be built in the State of Arizona between December 30, 2004 and June of 2009 by Anderson's construction companies, primarily Dynamite Custom Homes L.L.C. (Exhibit "A" Indictment). After trial the Government dismissed Counts 7,15, 28, & 29. (Dynamite Custom Homes was dissolved in June 2009, along with other Construction Companies Anderson was involved in).

Petitioner and Anderson's joint trial started on May 8, 2014 and ended on June 4, 2014 when the jury returned verdicts against Plany and Anderson. Petitioner was found not guilty on Counts 1, 2, 3, and 8, and guilty on Counts 4-6, 9-14, 16-27, and 30-32. On May 18, 2015, Petitioner was sentenced to 48 months incarceration and 5 years supervised probation on each count, to run concurrently. Co-defendant Anderson was sentenced to 96 months incarceration, and 3 years of supervised probation on Counts 1-27 and 30-32, to run concurrently.

Petitioner and Anderson filed a joint direct appeal to the Ninth Circuit Court of Appeals on Oct. 10, 2017, Case No. 2:12-cr-01606-SRB-2. Petitioner and Anderson raised the following issues in their appeal: [1] Did the district court err in denying Plany's

motion to dismiss the Conspiracy (Count 32) on the ground that it was duplicitous? [2] Must the judgment be reversed because the district court erroneously denied a for-cause challenge of a juror by Appellant, violated Appellant's Sixth Amendment right to a fair and impartial jury? [3] Were Appellant's rights to counsel, an impartial jury, due process and a fair trial violated when a juror slept during critical portions of the trial? [4] Did the district court err in not giving a specific unanimity instruction regarding Count 32 (Conspiracy)? [5] Did the district court err in denying appellant's motion to dismiss, or alternately, for a new trial based on prosecutorial misconduct? [6] Did the district court err in failing to grant appellant's Rule-29 motion for acquittal, or, alternatively, for a new trial? [7] Did the district court err in its post-sentencing grant of restitution?

On October 10, 2017, the Ninth Circuit Court of Appeals reversed Anderson's conviction on Count (1), and affirmed all the other convictions and sentences of Anderson and Petitioner. A copy of the Ninth Circuit Court's decision is included as (Exhibit "B").

Petitioner then filed a Petition for Writ of Certiorari with the U.S. Supreme Court on February 21, 2018, Case No. 17-7898. Petitioner raised the following issues in the Writ: [1] Whether the Ninth Circuit's decision in the instant case that forged signatures on construction draws and inflated/false invoices were material because they were merely "capable of influencing" a bank to part with money in its control, directly conflicts with this Court's decision in *Loughrin v. United States*, 134 S.Ct. 2384 (2014), which set forth

a significant, textual limitation on §1344's "means" test by finding that the misrepresentation must be "the mechanism naturally inducing a bank to part with money in its control"? [2] Whether under 18 U.S.C. § 1344, the Government must prove the inter-relationship between "financial institutions", as defined by 18 U.S.C. § 20, and non-"financial institutions" when offering evidence which shows both types of financial entities were involved in the alleged bank fraud scheme. On March 26, 2018, the Writ was denied. A copy of the Supreme Court's denial is included as (Exhibit "C").

Other than the direct appeals listed above, no other petitions, applications, or motions concerning this judgment of conviction have been raised in any court, and no motion, petition or appeal is pending in any court for the judgments Petitioner is challenging, and Petitioner does not have any future sentence to serve after the completion of the sentence set forth herein.

## TIMLENESS OF MOTION

This petition complies with the (1) year requirement of 28 U.S.C. §2255. The U.S. Supreme Court denied Petitioner's Writ of Certiorari on March 26, 2018. (Exhibit "C").

## STATEMENT OF FACTS

Petitioner, his wife and son lived in Arizona during the time of the alleged charges. Petitioner had no criminal history and had a good job before he met Paxton "Anderson." Anderson offered him a job as office manager of his company, Dynamite Custom Homes. Petitioner eventually took the job. Petitioner had no experience as an office manager for a

home construction company, but had a business degree that gave him the basic skills to run an office. (Petitioner was not a C.P.A. as alleged by the Government).

Petitioner eventually discovered something was wrong when he found loan applications for home buyers were being falsified, so they could qualify for a loan to build a house, (and) when Anderson told him to help co-conspirators falsify the loan applications. When Petitioner questioned Anderson about this, Anderson told him the buyers knew about the false statements, and it was not a problem, because after the house is built the construction loan would be paid off when it was sold.

The conspiracy arose when four or five people made an agreement with Anderson, wherein they would get 'straw buyers" approved for construction loans, by falsifying their loan applications. Anderson would build the home, and when the home was sold the construction loan would be paid off, and they would split the profit. The profit was the difference between what it cost to build the home, and what it sold for. The co-conspirators were brokers and loan officers, and one was the owner of a company that prepared false documents that stated the buyers were employees, and were making a good salary. A 'straw buyer' is a person who buys a home; states in the loan application it would be their primary residence, which it would not, with the intent to sell the home for a profit. The false information in the loan applications varied, from stating the home was going to be their primary residences, to creating income documents and putting money in and out of the straw buyer's bank account, so they would qualify for a loan. When

Anderson used his relatives as straw buyers, Petitioner did not think there was anything wrong with doing this because it would not hurt anyone.

However, unknown to the co-conspirators, Anderson had his own plan for making money: once the construction loan was approved, and the money was available to build the home, Anderson would have Petitioner submit a forged "Draw Consent Form" to M&I Mortgage Company. The Draw would be approved, and the money would be deposited in one of Anderson's company accounts, primarily Dynamite Custom Homes.

Instead of Anderson using the money to build the homes, he used it to live an extravagant life style, which included buying and selling race horses. When Petitioner questioned Anderson about using the money in the business accounts to pay his personal debts, Anderson told him the money he was taking out of the business accounts was his profit. However, when home buyers and sub-contractors started complaining, Petitioner realized Anderson had taken so much money out of the business accounts, there was not enough left to build the homes.

At Plany's Sentencing hearing the Court stated, **"…But Mr. Plany didn't benefit,… he didn't get any of this money for himself or for any company over which he had any… for which he had any interest." "He was a mere employee… There's no evidence that he was an owner or participant in profits or in any way from Dynamite Custom Homes or the other entities that might have existed."** (RT 5/18/15 at pg. 6, Para. 2&3). The Court further stated, **"I don't know what it was about**

**Mr. Anderson that caused Mr. Plany to basically commit fraud, commit fraud for $2200 every other week,"** (Plany's salary) and, **"There was nothing in the evidence at trial that indicated that Mr. Plany was ever going to have a opportunity to participate in these hoped-for huge profits that they were going to make as a result of the speculation in custom homes."** (RT 5/18/15 at pg. 64, para. 3).

At Anderson's Sentencing hearing the Court stated, **"…And based on the evidence at trial, Mr. Anderson used these loan proceeds, clearly exceeding a million dollars, for things that not only included buying and supporting and racing horses, but also indirectly to continue to prop up Dynamite Custom Homes by paying for things with construction draws that shouldn't have been paid for, like to make mortgage payments, by falsifying construction draws, taking construction draws on trumped-up invoices for nonexistent entities."** (RT 5/18/15 at pg. 7 para 3). The Court further stated, **"For Mr. Anderson, however, having heard all the evidence at trial and having reviewed the objections, the response and addendum, I agree that there is no question but that Mr. Anderson was an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive." "He was also the person that directed his employees to commit the various frauds that were committed after the loans were obtained, including obtaining draws based on fraudulent invoices forged signatures, cut-and-pasted signatures and so this… his activities as an organizer or leader went way beyond… well beyond the frauds that**

**were involved simply on the loan application, but proceeded beyond that involved numerous other individuals…."** (RT 5/18/15 at pg. 9, para. 1).

## GROUNDS FOR RELIEF

### I.  INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL.

The benchmark for assessing a claim of ineffective assistance of counsel is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). Defendant must demonstrate (1) "that counsel's representation fell below an objective standard of reasonableness" and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Williams v. Taylor*, 529 U.S. 362, 390-91 (2000), quoting *Strickland*, 466 U.S. at 688, 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Wiggins v. Smith*, 539 U.S. 510, 525 (2003). It has long been held that criminal defendants are entitled to effective assistance of counsel during all critical stages of the criminal process. *Powell v. Alabama*, 287 U.S. 45, 57 (1932); *Brewer v. Williams*, 430 U.S. 387 (1977). During all critical stages of a prosecution, it is counsel's "duty to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution." *Strickland*, 466 U.S. at 688. Those obligations ensure that the ultimate authority remains with the defendant "to make certain fundamental decisions regarding

the case, as to whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal." *Jones v. Barnes*, 463 U.S. 745, 751 (1983).

In the early stage of the case, Petitioner's counsel was remiss in not making himself aware of Petitioner's role in the case, so he would have known Petitioner was not a major participant. Once counsel knew this, he should have approached the prosecutor and negotiated a cooperating witness agreement for his client. Counsel is a seasoned federal criminal defense attorney. (*See* Exhibit "D", excerpt from e-mail), sent two months before trial, where Petitioner's counsel stated, "**In more than 30 years of practice in Federal court in Arizona….**" Based on the circumstances of this case, there is no excuse for counsel not pursuing a resolution of Petitioner's charges at an early stage of the case. Counsel had to know that in conspiracy cases, and multiple defendant cases, timing is critical, so being one of the first attorneys to approach the prosecutor, to negotiate a cooperating witness agreement, would be unquestionably the way to get the best results for your client. Especially if your client can give the prosecutor what he needed: A lower level person, who could testify to how the conspiracy worked, which Plany could.

The prosecutor confirmed this process, by stating, "**We were absolutely interested in cooperation of Plany…. Indeed, many of the witnesses during trial Prep have expressed surprise that he did not come in to help himself…. Given**

**Plany's inside role he should have cooperated but didn't**." (*See* Exhibit "E", excerpt from e-mail).

Unfortunately, Petitioner's counsel never took advantage of this opportunity. Counsel waited three years before appaching the prosecutor to try and resolve Petitioner's case. When he did, the prosecutor told counsel, **"It isn't until nearly three years later that he** (Plany) **has decided to cooperate in some last ditch effort."** (*See* Exhibit "E", excerpt from e-mail). By that time all the co-conspirators and others involved in the case had made favorable plea and immunity agreements with the prosecutor, so Plany's testimony was not needed. One of the people involved in the case, a co-worker of Plany's, received immunity (not charged) for her testimony. She did the same things Plany did, plus stole thousands of dollars from Anderson companies. Therefore, there is more than a reasonable probability the outcome in Plany's case would have been different, but for counsel's misfeasance, and even malfeasance, in his representation of Petitioner.

## II.     PETITIONER WAS DENIED DUE PROCESS.

A district court should grant a severance under Rule 14 if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence. *Zafiro v. United States*, 506 U.S. 534, 539, 113 S. Ct. 933, 938 (1993). The defendant seeking severance bears the burden of showing undue prejudice of such a magnitude that, without

severance, he will be denied a fair trial. *See United States v. Jenkins*, 633 F.3d 788, 807 (9th Cir. 2011). Prejudice may arise where: (a) the jury could confuse and cumulate the evidence of one charge to another; (b) the defendant could be confounded in presenting his defenses; and (c) the jury could erroneously conclude the defendant is guilty on one charge and therefore convict him on another based on his criminal disposition. *United States v. Johnson*, 820 F.2d 1065, 1070 (9th Cir. 1987).

Petitioner and Anderson were tried together, the only two defendants that had not resolved their case. Petitioner's counsel and Anderson's counsel agreed to a "Joint Defense," and that Anderson's counsel would be the lead attorney in presenting the defense.

Almost all the evidence presented at trial was against Anderson, who was the mastermind of the conspiracy, and had stolen millions from the people who had hired him to build them a home. As opposed to Plany, who was an employee of Anderson, and did not receive any money from the conspiracy or from the money Anderson stole from his companies.

Numerous times during the trial, the prosecutor argued that Petitioner was as guilty as Anderson, because he was a CPA (Certified Public Accountant), and therefore had to know about the conspiracy, and suggesting throughout the trial that Plany received money from the conspiracy, and the money Anderson stole from his companies.

The joint defense agreement prevented Plany from testifying in his own behalf, because if he testified, his testimony would have been damaging to Anderson. If Plany had testified, he would have been able to separate himself from Anderson, and respond to the prosecutor's allegations that he was as guilty as Anderson. If Petitioner had testified, he would have been able to tell the jury: He was not a party to the conspiracy agreement between Anderson and the co-conspirators; That he was not a CPA; What his role was and that he was not in the conspiracy; He did not receive any money from the conspiracy or from the money Anderson stole from his companies; Anderson's intimidation of him; and that he had no intention to steal from the people who bought the homes or the companies. When Plany did not testify, the jury was left with the only logical conclusion they could make, based on the prosecutor's allegations, that Plany was as guilty as Anderson.

Counsel was an experienced criminal defense attorney, so he had to know what he was doing when he agreed to a joint defense, and that the joint defense agreement was not in the best interest of his client. Agreeing to a joint defense, under the circumstances of this case, can only be seen as counsel abandoning his client's defense, because there was no logical or tactical reason for Plany not to testify, and every reason for him to testify. Therefore, Petitioner's right to Due Process was violated, when he did not testify, because of his counsel's malfeasance.

## III. THE FEDERAL DISTRICT COURT DID NOT HAVE JURSDICTION IN A NUMBER OF THE CHARGES IN THE CASE.

It is a federal crime to knowingly execute, or attempt to execute, a scheme or artifice "(1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1344. "Financial institution" is defined, as relevant to this case, as any bank or savings association the deposits of which are insured by the Federal Deposit Insurance Corporation ("FDIC"). *See* 18 U.S.C. § 20(1); 12 U.S.C. § 1813(c)(2); *United States v. Bennett*, 621 F.3d 1131, 1133 (9th Cir. 2010). Thus, under §1344, the defrauded financial institution's federally-insured status is a jurisdictional prerequisite and necessary for the establishment of federal jurisdiction. *See United States v. Sanders*, 343 F.3d 511, 516 (5th Cir. 2003); *See also United States v. Ayewoh*, 627 F.3d 914, 917 (1st Cir. 2010) and *United States v. Key*, 76 F.3d 350, 353 (11th Cir. 1996).

In May 2009, Congress amended the definition of "financial institution" to include mortgage lending businesses. *See* 18 U.S.C.S. §20(10). The (31) Bank Fraud charges in Plany's Indictment, run from 12/10/2004 to 04/03/2007. The conspiracy charge (32) in Plany's Indictment, incorporates charges (1-31) as Overt Acts, and lists additional Overt Acts, that run from 12/03/2004 to 12/15/2007, so the amendment would not affect Plany's case.

### (a). M&I Bank FDIC insurance did not extend to M&I Mortgage Company.

In *United States v. Bennett*, 621 F.3d 1131, 1133 (9th Cir. 2010), the important facts are the same as in Petitioner's case. In *Bennett* the defendant was convicted of three (3) counts of bank fraud arising from mortgages that the defendant fraudulently procured from Equicredit Corporation, a wholly-owned subsidiary of Bank of America. The evidence against the defendant was that he fraudulently procured funds from Equicredit; that Equicredit itself was not FDIC-insured; that Equicredit was a wholly-owned subsidiary of Bank of America; and that Bank of America was FDIC-insured. Based upon these facts, the Ninth Circuit concluded that no rational trier of fact could have found the defendant guilty under 18 U.S.C. § 1344 because defendant did not defraud a "financial institution" or procure assets "owned by" a "financial institution." *Bennett*, 621 F.3d at 1138. The Ninth Circuit based its holding in *Bennett* on the reasoning that, "a parent corporation does not own the assets of its wholly-owned subsidiary by virtue of that relationship alone." *Id*. As a result, the Ninth Circuit found that the defendant's convictions for bank fraud could not stand. *Id*. In Plany's case: The loans were made by a subsidiary of a Bank, and the Bank was FDIC insured.

Based on the holding in *Bennett,* M&I Bank's FDIC insurance did not extend to its subsidiary, M&I Mortgage Corporation. Therefore, the federal court did not have jurisdiction in all the charges involving loans from MIMC. (The Wisconsin Department

of Finance shows M&I Mortgage Company (MIMV) was a private corporation, incorporated on January 11, 1993, and dissolved on December 1, 2006).

FDIC insurance is limited to insuring "Bank Deposits," money or the equivalent that is being held by a bank, such as Savings accounts, Checking accounts, CD's, Cashier's checks, etc. (*See* Exhibit "F", a self-authenticating e-mail/letter from the FDIC), that states FDIC insurance does not extend to mortgage companies, even when they are subsidiaries of FDIC insured banks, because mortgage companies are not "depository institutions."

### (b). Many of the financial transactions supporting the charges in this case were made by M&I Mortgage Corporation, Not M&I Bank.

Numerous times during Petitioner's trial the prosecutor referred to all the loans in general, and certain loans that were financed by M&I Mortgage Company, (MIMC). Exhibits in the trial unequivocally show M&I Mortgage Company was the lender in a number of loans the charges were based on: (*See* Exhibit "G", Draw Consent Forms). These forms were used by Anderson's companies to draw money from construction loans, and have it deposited in one of Anderson's company accounts, primarily Dynamite Custom Homes. The forms show the M&I Mortgage Corp. insignia at the top of the page; the loan number; under which it states M&I Mortgage Corp. Loan Number; signed approval; and where the money is to be deposited; in one of Anderson's company accounts, often in Dynamite Custom Homes account. (*See* Exhibit "H", Affidavit of

Contractor Forms**).** These forms show the M&I Mortgage Corp. insignia at the top of the page; the loan number; under which it states; M&I Mortgage Corp. Loan Number. (*See* Exhibit "I", Government Exhibits), that state the 'Lender' was MIMC, (M&I Mortgage Corp.).

## IV.   CONCLUSION

Based on the credible evidence present herein: [1] The Federal District Court did not have jurisdiction in a significant number of the charges in this case; [2] Petitioner received Ineffective Assistance of Counsel; and [3] Petitioner's right to Due Process was violated. Therefore, Petitioner's convictions should be set aside, and the case dismissed.

RESPECTFULLY REQUESTED THIS  24th   day of  January, 2019.

**ROSENQUIST & ASSOCIATES**

By:   /s/ Anders Rosenquist
         Anders Rosenquist
         *Attorney for Defendant/Petitioner*
         *Joseph John Plany*

**CERTIFICATE OF SERVICE**

E-FILED this  24th  day of of January 2019 with:

Clerk of the Court
United States District Court
District of Arizona – Phoenix
*VIA ECF*

By:  /s/ Tanya R. Hill