**NOT FOR PUBLICATION**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Joseph John Plany,<br><br>          Petitioner,<br><br>v.<br><br>United States of America,<br><br>          Respondent. | No. CV-19-00370-PHX-SRB<br>     CR-12-01606-02-PHX-SRB<br><br>**ORDER** |

The Court now considers Petitioner Joseph John Plany ("Petitioner")'s Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody ("Motion") (Doc. 1, Mot.). The matter was referred to Magistrate Judge Deborah M. Fine for a Report and Recommendation ("R&R"). (Doc. 16, R. & R.)

**I.  BACKGROUND**

    **A.  Factual Background**

The factual background of this case was summarized in the R&R and is incorporated herein:

> **I.  INDICTMENT**
>
> On September 11, 2012, [Petitioner] was indicted along with co-Defendant Paxton Jeffrey Anderson ("Anderson") on thirty-one counts of bank fraud pursuant to 18 U.S.C. § 1344, and one count of conspiracy under 18 U.S.C. § 1349. As asserted in the indictment, [Petitioner] was employed during the period relevant to the charges by Dynamite Custom Homes ("Dynamite") and subsequently by J.R. Custom Homes. Co-Defendant Anderson was the owner of Dynamite and worked as a home builder through Dynamite and then through J.R. Custom Homes. The charges centered on allegations of bank

fraud in that Defendants "devised a scheme to purchase real properties that misrepresented both material information in a uniform residential loan application" and required supporting documentation such as the applicant's "assets, income, liabilities, sources of intended down-payment, and intent to occupy the improved property as a primary residence." The indictment further described the scheme as including falsifying invoices, misrepresenting to lenders that work had been completed, and forging construction draw requests in order to obtain funds from the lenders.

The conspiracy charge asserted that [Petitioner], Anderson, and others "conspired, confederated and agreed with each other" to commit bank fraud "by engaging in an ongoing conspiracy to obtain real estate based on loan applications misrepresenting material information to the lender and misrepresenting that draw requests were used for construction expenses when in fact the draws were used for personal expenses of Anderson." The indictment alleged that the conspiracy would be accomplished by Anderson recruiting his family members, friends and others as "straw buyers" of construction loans with the purpose of obtaining draw requests from the lender. As part of the conspiracy, the indictment further alleged that Anderson and [Petitioner] "copied and pasted signatures from one document to another in order to qualify buyers for loans or directed others to do so." The indictment also alleged that Anderson deposited money into prospective borrowers' accounts to make it appear [as though] the borrowers had adequate assets to qualify for loans, and also gave the borrowers money for down payments, knowing it was being misrepresented to the lender that such payments were being made by the borrower. The indictment alleged that [Petitioner] falsified draw requests and also assisted borrowers by "falsely inflating borrower's bank accounts."

## II.  SUMMARY OF COURT PROCEEDINGS

On May 8, 2014, the case went to trial before a jury. At the close of the Government's case and on motion by the Government, the court dismissed with prejudice four bank fraud counts for lack of sufficient evidence. After a 13-day trial, on June 4, 2014, the jury found [Petitioner] guilty on 23 counts of bank fraud and on the conspiracy count.

On May 18, 2015, the Court sentenced [Petitioner] to 48 months of imprisonment to be followed by 5 years of supervised release. [Petitioner] and Anderson were ordered to jointly and severally pay restitution in the amount of $2,909,017.46.

Through appointed counsel, [Petitioner] filed a notice of appeal with the Ninth Circuit on August 25, 2015. [Petitioner] and Anderson appealed the Court's order denying their motion for acquittal and alternative motion for a new trial. In an unpublished memorandum opinion filed on October 10, 2017, the Ninth Circuit held there was not sufficient evidence to

support Count 1 in the indictment for bank fraud because "the evidence was insufficient to allow any rational juror to find, beyond a *reasonable doubt*, that M&I Bank was the lender for Count One." [Petitioner] had been acquitted on Count 1, and the Ninth Circuit's decision reversed Anderson's conviction on Count 1. However, the Ninth Circuit held there was "sufficient evidence to allow reasonable jurors to find that M&I Bank and TierOne were FDIC-insured institutions and were the lenders on the remaining counts." Among other holdings, the Ninth Circuit held that the conspiracy count in the indictment was not duplicitous, the Court did not err by "failing to give a specific unanimity instruction sua sponte" or by failing to reduce [Petitioner]'s sentence, or in its restitution order.

At trial, [Petitioner] was represented by retained counsel Thomas Hoidal. On appeal, [Petitioner] was represented by Michael J. Bresnehan. Counsel Anders V. Rosenquist represents [Petitioner] in these habeas proceedings.

### III.    [PETITIONER]'S HABEAS GROUNDS

[Petitioner] asserts three grounds for relief. In Ground One, [Petitioner] claims his trial counsel's performance was deficient because counsel failed to recognize early on in the case that [Petitioner] was not a "major participant" in the crimes alleged and failed to approach the prosecutor to negotiate a cooperating witness agreement.

[In] Ground Two[,] [Petitioner] claim[s] . . . that his due process rights were violated . . . when counsel agreed to a joint defense with co-defendant Anderson under which [Petitioner] agreed not to testify.

In Ground Three, [Petitioner] complains the Court lacked jurisdiction on several counts charged in his case because FDIC insurance for M&I Bank did not extend to M&I Mortgage Company, and "[m]any of the financial transactions supporting the charges in this case were made by M&I Mortgage Company, not M&I Bank."

(R. & R. at 2–4 (record citations omitted).)

### B.    Procedural Background

Petitioner filed the instant Motion on January 24, 2019. (Mot.) Respondent United States of America filed its Response on May 20. (Doc. 7, Resp. to Mot.) The Magistrate Judge issued her R&R on April 17, 2020, recommending that the Court: (1) deny Petitioner's Motion without an evidentiary hearing, and (2) deny a certificate of appealability because Petitioner failed to make a substantial showing of the denial of a constitutional right. (R. & R. at 20–21.) Petitioner timely filed his Objections on May 1.

- 3 -

(Doc. 17, Obj. to R. & R. ("Obj.").)

## II. LEGAL STANDARD

A federal prisoner may seek relief under 28 U.S.C. § 2255 if his sentence was "imposed in violation of the United States Constitution or the laws of the United States, . . . was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). When a prisoner moves for post-conviction relief, the court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. § 636(b)(1). If a petitioner files timely objections to the report and recommendation, the district court must make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. *Id.*; *see also United States v. Reyna–Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc) (stating that district court is not required "to review, de novo, findings and recommendations that the parties themselves accept as correct").

## III. ANALYSIS

### A. Ineffective Assistance of Counsel

To prevail on an ineffective assistance of counsel ("IAC") claim, a petitioner must show that (1) counsel's representation fell below an objective standard of reasonableness, and (2) the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The "objective reasonableness standard" does not demand best adherence to best practices—or even adherence to common custom. *See Harrington v. Richter*, 562 U.S. 86, 105 (2011). With respect to the second prong, a petitioner must affirmatively prove prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Recognizing the temptation for defendants to second-guess the efficacy of counsel's representation following an unfavorable ruling, *Strickland* mandates a strong presumption of both adequate assistance and the exercise of reasonable professional judgement on the part of counsel. *Id.* at 690; *see Cullen v. Pinholster*, 563 U.S. 170, 189

(2011). And although the *Strickland* test is dual-pronged, a court may consider either prong first. *Strickland*, 466 U.S. at 697; *see also LaGrand v. Stewart*, 133 F.3d 1253, 1270 (9th Cir. 1998) (stating that courts need not look at both deficiency and prejudice if petitioner cannot establish one or other).

### 1. Ground One: Witness Agreement
#### a. "Major Participant"

In Ground One, Petitioner claims that his trial counsel's performance was deficient because counsel failed to "make himself aware of Petitioner's role in the case." (*See* Mot. at 9.) Petitioner argues that because he was "not a major participant" in the conspiracy, but merely a "lower level person who could testify [as] to how the conspiracy worked," counsel's failure to approach the prosecutor to negotiate a cooperating witness agreement gives rise to an IAC claim. (*Id.* at 9–10.) In his Objections, Petitioner maintains that he was not a "major participant" in the conspiracy, and the R&R's conclusion otherwise is "inconsistent with the evidence presented at trial." (Obj. at 2; *see* R. & R. at 6.) Petitioner highlights the following statements made by the trial court during his sentencing:

> 'But [Petitioner] didn't benefit, . . . he didn't get any of this money for himself or for any company over which he had any . . . for which he had any interest.' 'He was a mere employee… There's no evidence that he was an owner or participant in profits or in any way from Dynamite Custom Homes or the other entities that might have existed.' . . . 'I don't know what it was about Mr. Anderson that caused [Petitioner] to basically commit fraud, commit fraud for $2200 every other week,' and, 'There was nothing in the evidence at trial that indicated that [Petitioner] was ever going to have an opportunity to participate in these hoped for huge profits that they were going to make as a result of the speculation in custom homes.'

(Obj. at 2 (record citations omitted).) Petitioner, however, improperly equates the likelihood of earning "major" profits with the role of "major participant"—two wholly unrelated undertakings. Evidence presented at trial demonstrates that Petitioner performed the bulk of the clerical tasks associated with the falsification of loan applications, forging construction loan draw requests, and invoices for unperformed work. (*See* R. & R. at 7–10; *see also* No. 12-cr-1606-PHX-SRB, Doc. 503, Sentencing Hr'g Tr. ("Snt'g Hr'g Tr.")

at 64:19–23 ("[Petitioner] was an integral participant in this fraud on a day-to-day basis. He was the person that produced the documentation that resulted in the fraudulent draws. He cut and pasted. He forged. He created fraudulent invoices.").) In short, while Anderson may have been the architect of the fraudulent scheme, "it really probably couldn't have happened or at least happened for as long as it did without [Petitioner] on a day-to-day basis committing all of these fraudulent acts." (Snt'g Hr'g Tr. at 65:13–15.)

Consequently, the matter of Petitioner's prospective financial payout—or lack thereof—is immaterial to the harm that his fraudulent actions caused the victims of the conspiracy. As the district court emphasized at Petitioner's sentencing:

> People lost their life savings. They filed for bankruptcy. They've had their credit ruined. And the stress that it placed them under may not be the same stress that [Petitioner] is feeling today, but they were under significant and long-lasting financial stress that I'm sure took a substantial toll on them, mostly because of Anderson and [Petitioner].

(*Id.* at 66:10–15.) The Court therefore agrees with the R&R, that counsel's representation with respect to the issue of whether Petitioner was a "major participant" cannot be characterized as constitutionally ineffective.

### b. Failure to Negotiate Cooperating Witness Agreement

Petitioner further objects to the R&R's conclusion that his IAC claim fails because "the record indicates that [he] was not inclined to pursue a witness agreement." (Obj. at 3; R. & R. at 10.) On August 8, 2010, more than two years before he was indicted, Petitioner disclaimed knowledge of a conspiracy, advising FBI and IRS agents that "he had 'nothing to hide.'" (Doc. 7-1, Ex. A, Mem. of Interview at 1–2.) According to the agents, Petitioner stated that (1) he had "nothing to do with the mortgage side of the business," and did "not know if loan documents [had been] falsified"; (2) "there was no hidden money or ulterior motive"; and (3) he "was never aware of anyone copying and pasting signatures on documents." (*See id.*) In a letter dated April 28, 2011, Petitioner's trial counsel reminded the prosecutor of Petitioner's August 2010 interview with the agents, reiterating that Petitioner "was unaware of any wrongdoing in connection with his involvement with []

- 6 -

Anderson and does not believe it would serve any purpose for him to repeat that information in another interview." (Doc. 7-2, Ex. B, 04/28/11 Letter at 1–2.)

Nevertheless, as the R&R correctly notes, "[n]owhere in [Petitioner]'s argument does he state that the [prosecutor] approached his counsel to discuss a cooperative agreement, or, significantly, that [Petitioner] would have been willing *at that time* to enter such an agreement." (R. & R. at 11 (emphasis added) (citing Mot. at 8–10; Doc. 8, Reply to Resp. ("Reply") at 3–4).) Petitioner objects that his pre-indictment behavior should not dictate the outcome of his IAC claim because it "does not show that [he] could not [have] reached a plea agreement in the interim, once he was indicted, once he finally took his case seriously." (Obj. at 3.) But Petitioner fails to acknowledge that the prosecutor was only interested in his cooperation *pre-indictment*. (Doc. 1-2, Ex. E, 03/27/14 Email.) Petitioner offers no evidence indicating that the prosecutor was interested in a cooperation agreement "in the interim, once Petitioner was indicted, once he finally took his case seriously." (Obj. at 3.) Indeed, Petitioner cannot. (*See, e.g.*, 03/27/14 Email ("[B]y June 2013 we were not interested. By that point I had several meetings with S.G., Blemaster, Sanchez, Baily and others and had no need for [Petitioner] . . . . It isn't until nearly three years later that he has decided to cooperate in some last ditch effort.").)

Petitioner next argues that a "competent criminal defense attorney" should know that "most clients will deny or minimize their involvement in a crime" and "obtaining a plea agreement is part of getting the best result for [a] client[.]" (Obj. at 4–5.) This argument, too, fails to address the fundamental flaw in Petitioner's IAC claim: he was unwilling to enter a cooperating witness agreement until the window of opportunity had long been closed. The Court agrees with the R&R's conclusion: Petitioner has not established—nor does the record support—that his trial counsel's representation was constitutionally ineffective with respect to the failure to enter a cooperating witness agreement. (R. & R. at 12.) The Court overrules Petitioner's objections and adopts the R&R with respect to Ground One.

**2.     Ground Two: Joint Defense Agreement**

In Ground Two, Petitioner argues that his trial counsel's decision to enter a joint defense agreement with Anderson resulted in a violation of Petitioner's due process right to testify at trial. (Mot. at 12.) Petitioner claims that the joint defense agreement "prevented [him] from testifying on his own behalf because if he testified, his testimony would have been damaging to Anderson." (*Id.*; *see also id.* ("When [Petitioner] did not testify, the jury was left with the only logical conclusion they could make, based on the prosecutor's allegations, that [Petitioner] was as guilty as Anderson.").) Per Petitioner, "under the circumstances of this case," entering a joint defense agreement "can only be seen as counsel abandoning [Petitioner]'s defense." (*Id.*) Petitioner argues that his trial should have been severed from Anderson's and failure to do so resulted in his counsel's failure to present an effective defense. (*See* Obj. at 5–6.) The Court disagrees.

As the R&R explains, by "allowing Anderson's counsel to take the lead, the jury likely associated the bulk of the prosecution's evidence with Anderson, not [Petitioner]." (R. & R. at 13.) For example, during closing argument, counsel highlighted that when the conspiracy unraveled, the impacted homeowners blamed Anderson, not Petitioner. (No. 12-cr-1606-PHX-SRB, Doc. 461, Jury Trial-Day 12 Tr. at 2202:3–21 (counsel describing three individual homeowners who blamed Anderson for their respective losses).) Counsel further highlighted that the evidence presented during trial demonstrated that Petitioner lacked independent authority to do much of anything at Dynamite or J.R. Custom Homes. (*Id.* at 2200:16–2201:3 (counsel arguing that Petitioner "inten[ded] to get the homes built," not "defraud the banks").) To a certain extent, Petitioner's counsel succeeded with this strategy of innocence-by-comparison: the jury found Petitioner not guilty on three counts on which they found Anderson guilty. (No. 12-cr-1606-PHX-SRB, Doc. 462, Jury Trial-Day 13 Tr. at 2263:9–2265:21.) The Court concludes that Petitioner's counsel satisfied the standard set forth in *Strickland*: he offered adequate assistance and exercised reasonable professional judgment in entering the joint defense agreement. *See* 466 U.S. at 690.

Petitioner also takes issue with the R&R's purported failure to address the due process violation inherent in the joint defense agreement. (*See* Obj. at 5–6.) Again, the

Court disagrees with Petitioner. Through its discussion of *Zafiro v. United States*,[1] the R&R appropriately considers the general advantages and disadvantages of joint defense agreements, as well as associated risks. (*See* R. & R. at 13–14.) In *Zafiro*, the Supreme Court outlined the federal criminal system's preference for joint trials: "They promote efficiency and 'serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'" 506 U.S. at 537 (quoting *Richardson v. Marsh*, 481 U.S. 200, 210 (1987)). But *Zafiro* also recognizes that in certain circumstances, "joinder, even when proper under [Federal Rule of Civil Procedure] 8b, may prejudice either a defendant or the Government," so a district court may "grant a severance of defendants or provide whatever other relief justice requires." *Zafiro*, 506 U.S. at 538 (quoting Fed. R. Civ. P. 14). Further, "[w]hen the risk of prejudice is high, a district court is more likely to determine that separate trials are necessary, but . . . less dramatic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." *Zafiro*, 506 U.S. at 539 (citing *Richardson*, 481 U.S. at 211).

At the close of Petitioner's trial,

> the [district court] gave the jury the limiting instruction that '[s]eparate crimes are charged against each defendant. The charges have been joined for trial. You must consider and decide the case for each defendant on each crime charged against that defendant separately. Your verdict on any count as to any defendant should not control your verdict on any other count or as to any other defendant.'

(R. & R. at 14 (citing Jury Trial-Day 12 Tr. at 2128:20–2129:4).) This limiting instruction, in conjunction with the ample evidence presented by the Government at trial concerning Petitioner's integral role in the conspiracy that supported Petitioner's guilt on the charges that went before the jury, indicates that Petitioner's counsel's decision to enter a joint defense agreement did not prejudice Petitioner's defense. *See Strickland*, 466 U.S. at 690. And given *Strickland*'s heavy presumption in favor of assuming adequate assistance by counsel, the Court declines to second guess counsel's defense strategy. *Id.* Petitioner has therefore failed to show a reasonable probability that the outcome of the trial would have

---

[1] 506 U.S. 534 (1993).

been different if his case had been severed from Anderson's. *Id.* at 694; (*see* R. & R. at 15). The Court overrules Petitioner's objections and adopts the R&R with respect to Ground Two.

### B. Ground Three: Lack of Jurisdiction Over Charges

In Ground Three, Petitioner argues that because M&I Bank's FDIC insurance did not extend to M&I Mortgage Company, and the district court's jurisdiction was based on M&I Bank's FDIC insurance, the district court lacked jurisdiction over all charges related to loans from M&I Mortgage Company. (Mot. at 14.) Petitioner's objections reiterate precisely the same point, but notably fail to address the R&R's ultimate conclusion as to why Petitioner's jurisdictional argument lacks merit. (*See* Obj. at 7–9.) The argument "wholly depends on facts and legal argument[s] that [Petitioner] already raised on direct appeal and that the Ninth Circuit rejected." (R. & R. at 17.) The Ninth Circuit held that there was

> sufficient evidence to allow reasonable jurors to find that M&I Bank and TierOne were FDIC-insured institutions and were the lenders on the remaining counts. The evidence consisted of proof of insured status; testimony from Daly, Blemaster, and Sanchez; Tasha Heinstein's testimony regarding draw requests to M&I Bank; copies of loan applications and draw requests; and payment information.

(Doc. 1-2, Ex. B, *United States v. Plany*, 711 F. App'x 392, 394 (9th Cir. 2017) (mem.).) The district court also rejected the jurisdictional argument underlying Ground Three. First, in its ruling on Petitioner's motion for acquittal at the close of trial; second, in its ruling on Petitioner's subsequent Motion for Acquittal or, Alternatively, Motion for a New Trial. (*See* No. 12-cr-1606-PHX-SRB, Doc. 239, 07/08/14 Order at 1–3; *id.*, Doc. 277, 09/23/14 Order at 1–7.)

It is well-settled that "[i]ssues raised at trial and considered on direct appeal are not subject to collateral attack under 28 U.S.C. § 2255." *Egger v. United States*, 509 F.2d 745, 748 (9th Cir. 1975) (citing *Clayton v. United States*, 447 F.2d 476, 477 (9th Cir. 1971); *Jordan v. Richardson*, 443 F.2d 32 (9th Cir. 1971)); *see United States v. Redd*, 759 F.2d 699, 701 (9th Cir. 1985). And "[g]rounds which were apparent on original appeal cannot

be made the basis for a second attack under § 2255." *Egger*, 509 F.2d at 748 (citation omitted). Because Petitioner has now thrice raised the jurisdictional argument underlying Ground Three, Ground Three cannot be the basis of a § 2255 Motion. The Court overrules Petitioner's objections and adopts the R&R with respect to Ground Three.

**CONCLUSION**

Having reviewed the record de novo, the Court overrules Petitioner's Objections, adopts the R&R, and denies Petitioner's Motion. The Court agrees with the R&R's conclusion that the grounds in Petitioner's Motion are without merit and do not warrant an evidentiary hearing. (R. & R. at 20.) Petitioner did not request an evidentiary hearing and does not object to the R&R's recommendation that the Court deny Petitioner's Motion without an evidentiary hearing. (*See id.*; Mot.; Obj.)

**IT IS ORDERED** overruling Petitioner's Objections to the Magistrate Judge's Report and Recommendation (Doc. 17).

**IT IS FUTHER ORDERED** adopting the Report and Recommendation of the Magistrate Judge as the Order of this Court (Doc. 16).

**IT IS FURTHER ORDERED** denying Petitioner's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody without an evidentiary hearing (Doc. 1).

**IT IS FURTHER ORDERED** denying any Certificate of Appealability because Petitioner has not demonstrated that jurists of reason would find it debatable whether the Court abused its discretion in denying Petitioner's Motion, or that jurists of reason would find it debatable whether Petitioner's Motion states a valid claim for the denial of a constitutional right.

. . .

. . .

. . .

. . .

. . .

**IT IS FURTHER ORDERED** directing the Clerk to enter judgment accordingly.

Dated this 30th day of July, 2020.

_____
Susan R. Bolton
United States District Judge